Filed 2/21/23  P. v. Denem CA2/3

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> ROLLIN DENEM, <br><br> Defendant and Appellant. | B318106 <br><br> (Los Angeles County Super. Ct. No. BA240172-05) |

APPEAL from an order of the Superior Court of Los Angeles County, Ronald S. Coen, Judge.  Affirmed.

John Steinberg, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Charles S. Lee and David E. Madeo, Deputy Attorneys General, for Plaintiff and Respondent.

Years ago, Rollin Denem participated in an armed robbery during which his accomplice shot and killed a security guard. A jury convicted Denem of felony murder. Thereafter, Denem petitioned for resentencing under recently-enacted Penal Code[1] section 1172.6,[2] which limited accomplice liability for murder. After an evidentiary hearing under that section, the trial court denied Denem's petition, finding that he was a major participant in the felony who acted with reckless indifference to human life. Denem now appeals the trial court's order denying his petition. Finding sufficient evidence to support that order, we affirm.

## BACKGROUND

I.      The robbery and murder[3]

Denem was jointly tried with Thomas Bridges, Claudell Hatter, and Wardell Joe. The evidence at their trial showed that in 1998, the men, assisted by Reginald Howard, Jesse Singleton, Amar Mobley, and Tiasha Croslin, committed an armed robbery at a market during store hours, when employees and customers were present. The robbers were all members of 69 East Coast Crips, except Bridges, who was a member of a related gang, and Croslin, Bridges's girlfriend, who had been a member of a San Diego gang. In the course of the robbery, Howard shot and killed

---

[1]      All further undesignated statutory references are to the Penal Code.
[2]      Effective June 30, 2022, section 1170.95 was renumbered to section 1172.6, with no change in text. (Stats. 2022, ch. 58, § 10.)
[3]      We derive the background from our opinion affirming Denem's judgment of conviction. (*People v. Bridges* (Jan. 30, 2006, B176263 [nonpub. opn.].) We have granted Denem's request for judicial notice of the record in that appeal. (Evid. Code, § 452, subd. (d).)

the security guard, Juan Hernandez.  The robbers also took Hernandez's gun.  Bridges robbed a cashier at gunpoint, obtaining money and food stamps.  Leonard Jackson, a gang associate of the robbers, arrived at Hatter's home just as the robbers returned from the crime scene.

Eyewitness Gilbert Davis lived down the street from the market.  He became suspicious when he saw a Buick Regal, an Oldsmobile Cutlass, and a Pontiac Trans Am in front of his home.  Davis saw four men enter the market.  Davis and his friends walked toward the market.  The Cutlass's driver, who was alone in the car, looked straight ahead.  Someone then got into the Cutlass, and they took off.

A market employee saw three men looking around the store.  One man, identified as Denem, wore a hat and had long curly hair.[4]  Denem ordered everyone to get down, pointed a gun at the ceiling, and fired one shot.  Thirty seconds later, the employee heard another shot.

The market's cashier saw the security guard struggling with two men.  The cashier heard a gunshot and saw one of the men run from the market.  The cashier ran to the manager's office, but the manager locked the door before she could enter.  An armed man took her at gunpoint to the cash registers and forced her to empty their contents into a bag.

The crime went unsolved for two years until Jackson offered to assist law enforcement in the hope of obtaining a reduction of a prison term he was serving.  In 2001, Jackson identified six of the robbers and offered the name of the seventh, Denem.  The detective then showed photographic lineups to the

---

[4]     There is no dispute that Denem had disguised himself with a hat and wig.

3

market employees. One identified Singleton and Bridges; a second identified Howard; and two others identified Singleton. The cashier could not identify anyone, although, at trial she thought that Bridges looked similar to the man who forced her at gunpoint to empty the cash registers.

The neighbor who lived down the street, Davis, identified Hatter and Croslin as the individuals he had seen in the Regal outside the market and identified Joe as the driver of the Cutlass.

Croslin, who was now incarcerated in connection with an unrelated bank robbery, admitted her role in the robbery and identified the participants.[5] She and Jackson testified against Denem and his codefendants. At trial, Croslin testified that at the time of the crimes she lived with Bridges, and Jackson lived in the house in front of them. Through Bridges, Croslin met Hatter and Denem, both of whom were members of the 69th Street Crips. Hatter's nickname was Doughboy and Denem's nickname was Baby Doughboy, indicating the two had a close relationship.

On the morning of the robbery, Bridges and Croslin went to Hatter's home where Denem, Hatter, Joe, Bridges, Singleton, Howard, and Mobley discussed a robbery. Hatter said he needed money to get a car out of impound. When the conversation ended, Bridges told Croslin to get into a Regal with Hatter, who then drove them to the market. After Hatter and Croslin entered

---

[5]     Croslin initially faced a term of life without the possibility of parole for her involvement in the robbery. However, Croslin pleaded no contest to one count of voluntary manslaughter and two counts of robbery in exchange for a prison term of 12 years and her truthful testimony in this case.

4

the market, Hatter said, "This is where we're going to hit." Hatter and Croslin made a purchase, then left the store. They drove past a Cutlass driven by Joe and a parked Trans Am driven by Mobley. Shortly thereafter, Hatter and Croslin drove past the market and saw individuals running from it.

After the robbery, the entire crime team returned to Hatter's home. Howard was pacing and repeatedly said, in a scared manner, "I killed him, I killed him." They divided the money and food stamps obtained in the robbery.

When Croslin later learned that the security guard had been killed, Bridges told her, "Howard was tussling with the security guard and shot him." Bridges indicated his role was to get the money from the safe in the office with Denem or Singleton, and Howard was supposed to distract the security guard. Bridges said Denem wore a disguise of a hat and a curly wig.

Jackson testified that he was at Hatter's home when the robbers returned from robbing the market. Denem had a hat and a wig. Once inside, they argued. Hatter asked where the money was, and Bridges said they only got food stamps and complained that they would have gotten more if Howard had not been "so trigger happy." They divided the food stamps among themselves and gave Jackson some. When they saw a news reports of the robbery, Bridges and Denem said police sketches of the suspects did not look like them, and Denem laughed because the sketches depicted him as having long hair.

Two days after the robbery, Jackson was arrested for violating parole. Approximately five months after telling a detective what he knew about the robbery, Bridges and Jackson were incarcerated together. Bridges related details of the crime

to Jackson, saying that Hatter and Croslin entered the store first to "check the move out[.]"  Bridges said he and Denem intended to force the manager to open the safe at the back of the store, but the manager locked himself in a room.  When Bridges heard a shot, he ran with Denem to the front of the market and saw that Howard and Singleton already had fled.  Bridges then took food stamps from the cash register.  Bridges said Howard had a .45 caliber handgun.

II.    Verdict and sentence

In 2004, a jury convicted Denem of special circumstance murder (§§ 187, subd. (a), 190.2, subd. (a)(17); count 1) and of robbery (§ 211; counts 2 & 3) with true findings on principal gun use (§ 12022.53, subds. (c), (d) & (e)(1)) and gang (§ 186.22, subd. (b)(1)) allegations.[6]  That same year, the trial court sentenced Denem on count 1 to life without the possibility of parole plus 25 years to life for the gun enhancement. The trial court imposed but stayed the sentence on count 2 and imposed a concurrent sentence on count 3.

A different panel of this Division affirmed Denem's judgment of conviction.  (*People v. Bridges*, *supra*, B176263.)

III.    Postconviction proceedings

Thereafter, our legislature passed Senate Bill No. 1437 (2017–2018 Reg. Sess.) (Senate Bill 1437), which limited accomplice liability for murder and allowed eligible defendants convicted of murder to petition for resentencing.  In 2021, Denem petitioned for vacation of his murder conviction and resentencing

---

[6]    The jury found true the gang allegations only as to counts 1 and 3.

6

under that new law. The trial court appointed counsel to represent Denem, issued an order to show cause, accepted briefing, and held an evidentiary hearing at which Denem was present. At the evidentiary hearing, the parties did not offer any new or additional evidence. The trial court considered the trial evidence and the appellate opinion for the purposes of procedural history.

The trial court found that Denem was at a meeting to plan the robbery, was the person wearing a hat and wig, ordered everyone to get down, and fired a shot at the ceiling. The trial court further noted that Denem was an adult when the robbery was planned "and whether he was the active shooter or not, he did hold a gun shortly before or shortly after it was fired and was in sufficient proximity to observe his cohorts." Further, he fled the scene, which supported an inference he did not help the victim. Citing various cases, the trial court found that Denem was a major participant who acted with reckless indifference to human life and accordingly denied his petition.

## DISCUSSION

I.     Senate Bill 1437 and standard of review

Senate Bill 1437, which took effect on January 1, 2019, limited accomplice liability under the felony-murder rule and eliminated the natural and probable consequences doctrine as it relates to murder, to the end of ensuring that a person's sentence is commensurate with the person's individual criminal culpability. (*People v. Gentile* (2020) 10 Cal.5th 830, 842–843.) As relevant here, Senate Bill 1437 amended the felony-murder rule by adding section 189, subdivision (e), which provides that a participant in the perpetration of qualifying

7

felonies is liable for felony murder only if the person: (1) was the actual killer; (2) was not the actual killer but, with the intent to kill, acted as a direct aider and abettor; or (3) the person was a major participant in the underlying felony and acted with reckless indifference to human life, as described in section 190.2, subdivision (d). (*Gentile*, at p. 842.)

Senate Bill 1437 also added section 1172.6, which created a procedure whereby persons convicted of murder under a now-invalid theory of murder may petition for vacation of their convictions and resentencing. A defendant is eligible for relief under section 1172.6 if the defendant meets three conditions: the defendant (1) must have been charged with murder under a theory of felony murder, (2) must have been convicted of first or second degree murder, and (3) could no longer be convicted of first or second degree murder due to changes to sections 188 and 189 effectuated by Senate Bill 1437. (§ 1172.6, subd. (a).) If a petitioner makes a prima facie showing of entitlement to relief, the trial court shall issue an order to show cause (§ 1172.6, subd. (c)) and hold an evidentiary hearing at which the prosecution bears the burden of proving "beyond a reasonable doubt, that the petitioner is guilty of murder or attempted murder" under the law as amended by Senate Bill 1437 (§ 1172.6, subd. (d)(3)). The parties may offer new or additional evidence at the evidentiary hearing. (*Ibid.*) A "finding that there is substantial evidence to support a conviction for murder" is insufficient to meet this required showing. (*Ibid.*) The trial court sits as an independent factfinder to determine beyond a reasonable doubt whether the defendant is guilty of murder under a valid theory of murder. (*People v. Garrison* (2021) 73 Cal.App.5th 735, 745.)

On appeal, we review the trial court's findings for substantial evidence. (*People v. Clements* (2022) 75 Cal.App.5th 276, 298; accord, *People v. Mitchell* (2022) 81 Cal.App.5th 575, 591.) Under that standard of review we " ' "examine the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value that would support a rational trier of fact in finding [the defendant guilty] beyond a reasonable doubt." ' " (*Clements*, at p. 298.) We presume in support of the judgment the existence of every fact that can be reasonably deduced from the evidence. (*People v. Owens* (2022) 78 Cal.App.5th 1015, 1022.)

II.   Sufficiency of the evidence Denem was a major participant in the felony who acted with reckless indifference to human life

Denem contends that the trial court erred by denying his section 1172.6 petition because there was insufficient evidence to support its conclusion that he acted with reckless indifference to human life. We disagree.

A. *What it means to be a major participant who acts with reckless indifference to human life*

This area of law regarding what it means to be a major participant in a crime who acts with reckless indifference to human life has its genesis in two United States Supreme Court cases: *Enmund v. Florida* (1982) 458 U.S. 782 and *Tison v. Arizona* (1987) 481 U.S. 137. *Enmund* held that the death penalty could not constitutionally be imposed on an armed robbery getaway driver who was a minor participant in the crime,

was not present when the murder was committed, and had no intent to kill. (*Enmund*, at pp. 798, 801.)

In contrast, *Tison v. Arizona, supra*, 481 U.S. at page 139, did not preclude imposing the death penalty for two defendants, brothers, who had helped their father and his cellmate—both convicted murderers—escape from prison. The defendants gave them guns, and the group later kidnapped a family of four. The defendants then stood by while their father debated whether to kill the family and proceeded to shoot the family, including a toddler and a teenager. (*Id*. at pp. 139–141.) The court held that the Eighth Amendment does not prohibit imposing the death penalty on a nonkiller who lacked the intent to kill, but whose "participation [in the crime] is major and whose mental state is one of reckless indifference to the value of human life." (*Id*. at p. 152; see also *id*. at pp. 157–158.)

Years later, in *People v. Banks* (2015) 61 Cal.4th 788 (*Banks*) and *People v. Clark* (2016) 63 Cal.4th 522 (*Clark*), our Supreme Court addressed *Enmund* and *Tison* and substantially clarified the "major participant" and "reckless indifference to human life" requirements. *Banks*, at page 794, considered "under what circumstances an accomplice who lacks the intent to kill may qualify as a major participant." The court listed various factors that should be considered in making that determination: "What role did the defendant have in planning the criminal enterprise that led to one or more deaths? What role did the defendant have in supplying or using lethal weapons? What awareness did the defendant have of particular dangers posed by the nature of the crime, weapons used, or past experience or conduct of the other participants? Was the defendant present at the scene of the killing, in a position to facilitate or prevent the

actual murder, and did his or her own actions or inaction play a particular role in the death? What did the defendant do after lethal force was used?" (*Id.* at p. 803, fn. omitted.)

The court then turned its attention to "reckless indifference to human life" in *Clark*. Reckless indifference to human life is " 'implicit in knowingly engaging in criminal activities known to carry a grave risk of death.' " (*Clark*, *supra*, 63 Cal.4th at p. 616.) It "encompasses a willingness to kill (or to assist another in killing) to achieve a distinct aim, even if the defendant does not specifically desire that death as the outcome of his actions." (*Id.* at p. 617.) Recklessness has both a subjective and an objective component. (*Ibid.*) Subjectively, the defendant must consciously disregard risks known to him. Objectively, recklessness is determined by "what 'a law-abiding person would observe in the actor's situation,' " that is, whether defendant's conduct " 'involved a gross deviation from the standard of conduct that a law-abiding person in the actor's situation would observe.' " (*Ibid.*)

*Clark* listed factors to consider when determining whether reckless indifference existed: "Did the defendant use or know that a gun would be used during the felony? How many weapons were ultimately used? Was the defendant physically present at the crime? Did he or she have the opportunity to restrain the crime or aid the victim? What was the duration of the interaction between the perpetrators of the felony and the victims? What was the defendant's knowledge of his or her confederate's propensity for violence or likelihood of using lethal force? What efforts did the defendant make to minimize the risks of violence during the felony?" (*In re Scoggins* (2020) 9 Cal.5th 667, 677 [summarizing *Clark* factors].)

On appeal, Denem concedes he was a major participant. We therefore focus on whether he acted with reckless indifference to human life.

B. *Reckless indifference to human life*

Cognizant that the *Banks/Clark* factors overlap, we begin with Denem's use of and knowledge that guns would be used during the robbery. The evidence shows that four men entered the market and at least Denem and Howard were armed with guns. Although Denem's mere knowledge that he and at least one of his accomplices were armed is insufficient by itself to establish reckless indifference to human life (see, e.g., *Clark, supra*, 63 Cal.4th at p. 617), Denem *actively used* his gun to threaten the victims: he shot it at the ceiling as he ordered his victims to get down. Although Denem characterizes this act as an attempt to minimize violence by corralling the victims to prevent resistance, the trial court was entitled to draw another conclusion, that such use of his gun enabled the murder and exhibited reckless indifference to human life. (See, e.g., *People v. Bradley* (2021) 65 Cal.App.5th 1022, 1033 [wielding gun during robbery reflects reckless indifference to human life]; *People v. Bascomb* (2020) 55 Cal.App.5th 1077, 1089.) In *Bascomb*, the defendant used his gun to threaten and keep victims at bay during a bank robbery, thereby actively enabling the murder. The *Bascomb* defendant did not discharge his gun and yet was found to have exhibited reckless indifference to human life by merely displaying it threateningly. Here, Denem went much further than the *Bascomb* defendant by discharging his gun. And that Denem fired a shot into the air does not diminish the reckless indifference to human life of his act. To the contrary,

12

setting aside that a person could have been injured by a stray bullet, the mere discharge of the gun escalated the violence.

As for Denem's presence at the crime scene, he was clearly in the market. It is unclear, however, whether he was next to or near Howard when Howard shot the security guard, and thus in a position to restrain Howard. (Compare *In re Loza* (2017) 10 Cal.App.5th 38, 51, 53 [petitioner had time to observe and react before murder because he heard killer threaten to shoot clerk and count to five before doing so]; with *In re Scoggins, supra,* 9 Cal.5th at p. 679 [quickness of shooting suggested defendant lacked control over accomplices' actions]; *People v. Ramirez* (2021) 71 Cal.App.5th 970, 989 [defendant lacked meaningful opportunity to intervene when he and shooter were on opposite sides of victim's car, and attempted carjacking was quickly executed]; *In re Moore* (2021) 68 Cal.App.5th 434, 452 [defendant present during robbery but not " 'close enough' " to restrain shooter].) Some evidence suggests that Denem was at the back of the store near the manager's office when Howard shot the security guard closer to the front of the store. Thus, there was evidence that Denem was not in Howard's immediate proximity when Howard killed the security guard and did not have an immediate opportunity to restrain him. Still, it is unclear where all the robbers were at any specific time during the event, so, as the trial court said, Denem may have been in sufficient proximity to his accomplices to restrain them at various times during the robbery. This factor therefore could weigh for or against a finding of reckless indifference to human life.

Even so, there is no evidence that Denem did anything to minimize the risk of violence. Instead, the evidence is he heightened the risk of violence. His accomplices Hatter and

13

Croslin cased the market by entering it and buying something, which suggests that they could have seen the security guard and noted that he was armed.[7]  Yet, the robbers still targeted the market, deciding to rob it in the morning when numerous employees and customers, including children, were present. Denem and three of his accomplices entered the market armed, perhaps anticipating armed resistance and prepared to meet it. (Compare *In re Scoggins*, *supra*, 9 Cal.5th at p. 677 [defendant's plan to beat victim and steal his money did not involve use of weapons].)  Denem then told the victims to get down and shot his gun to make them comply, an act that would have greatly increased the fear and tension.  Indeed, that is apparently the effect it had.  The manager locked himself into the office, and the cashier attempted to escape to that office.  A market employee told a family to run away.  Moreover, Denem's use of his gun may have prompted the security guard to respond, resulting in the tussle with Howard.  Thus, instead of preventing resistance and the risk of death, the evidence supports a finding that Denem's conduct contributed to the security guard's death.

The next factor we examine is the crime's duration, because there is generally a greater opportunity for violence when victims are held at gunpoint or restrained for prolonged periods.  (*Clark*, *supra*, 63 Cal.4th at p. 620.)  It is unclear how long the event here lasted.  But it was long enough for Denem to try to restrain multiple victims by firing a shot, for the cashier to run to the back office, for Howard to shoot the security guard, and for the robbers to take food stamps and the security guard's gun. The events were also long enough to rouse a witness's suspicions.

---

[7]     At trial, Croslin testified that she could not remember seeing a security guard.

14

That is, a nearby neighbor, Davis, noticed the getaway cars, so he walked toward the market.  The evidence thus suggests that the events were of some duration.  Moreover, as we have noted, victims were held at gunpoint, increasing the chance of violence. (See, e.g., *People v. Owens, supra,* 78 Cal.App.5th at p. 1024 [bank robbery posed high risk of violence because it occurred during business hours with 20 people present and robbers were armed].)

As for what Denem knew about any propensity for violence Howard might have had, there is no evidence on this factor, other than that Denem, Howard, and the others were gang members. But mere co-membership in a gang is not necessarily enough to establish knowledge of a propensity for violence.  (See, e.g., *In re Miller* (2017) 14 Cal.App.5th 960, 976 [although defendant and killer belonged to same gang and had committed follow-home robberies together, no evidence they had participated in shootings, murder, or attempted murder].)  This factor is therefore neutral.

However, Denem's failure to aid the wounded security guard shows reckless indifference to human life.  (See, e.g., *Clark, supra,* 63 Cal.4th at p. 619; *In re Parrish* (2020) 58 Cal.App.5th 539, 544 [reckless indifference shown by failure to pause to aid or comfort victim]; *People v. Douglas* (2020) 56 Cal.App.5th 1, 10 [petitioner "displayed no interest in moderating violence or in aiding his bloody and suffering victim," and instead picked his pocket].)  Although this factor alone would be insufficient to establish reckless indifference to human life, it weighs in favor of that finding when considered with other factors.

Finally, although youth was not a factor that *Clark* cited as relevant to whether a defendant acted with reckless indifference

15

to human life, courts have considered it to be so.  (See, e.g., *In re Moore, supra,* 68 Cal.App.5th at p. 454 [hallmarks of youth—immaturity, impetuosity, and failure to appreciate risks and consequences—germane to mental state]; *People v. Harris* (2021) 60 Cal.App.5th 939, 960.)  Here, the trial court noted that Denem was not a juvenile when he committed his crimes.  Accordingly, youth was not a factor weighing against a finding he acted with reckless indifference to human life.

Reviewing the totality of this evidence, particularly Denem's discharge of his gun which heightened the risk of violence, it was sufficient to support the trial court's conclusion that Denem was a major participant in the robbery who acted with reckless indifference to human life.

## DISPOSITION

The order denying Rollin Denem's Penal Code section 1172.6 petition is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

EDMON, P. J.

We concur:

EGERTON, J.

NGUYEN (KIM), J.*

---

\* Judge of the Los Angeles County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

17